Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3938 | **DATE** | 10/29/2003 |
| **CASE TITLE** | Engineering Consulting Services vs. International Brotherhood of Operating Engineers, Local 150 | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing held and continued to 12/10/03 at 9:30A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: The Union's Rule 56(c) motion for summary judgment is denied. Final pretrial order to be submitted on 12/10/03.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | OCT 3 0 2003 | |
| | Notified counsel by telephone. | | date docketed | 68 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


DOCKETED
OCT 3 0 2003

ENGINEERING CONSULTING )
SERVICES, LTD., )
 )
       Plaintiff, )
 )
v. ) No. 02 C 3938
 ) Paul E. Plunkett, Senior Judge
INTERNATIONAL BROTHERHOOD OF )
OPERATING ENGINEERS, LOCAL 150 )
 )
       Defendant. )

### MEMORANDUM OPINION AND ORDER

Plaintiff Engineering Consulting Services, Ltd. ("ECS") has sued defendant International Brotherhood of Operating Engineers, Local 150 ("the Union") pursuant to section 303 of the Labor Management Relations Act, 29 U.S.C. § 187 ("LMRA"), for its alleged violations of section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158 ("NLRA"). The Union has filed a Federal Rule of Civil Procedure ("Rule") 56(c) motion for summary judgment. For the reasons set forth below, the motion is denied.

### The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth



of the matters asserted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. Id.

## Background

ECS, a Virginia corporation that has an office in Buffalo Grove, Illinois, provides material testing services to property owners and construction project managers. In the summer of 2001, the Union began a campaign to organize employees in the material testing industry. On February 5, 2002, the employees of ECS voted against Union representation in an NLRB-administered election.

The Union challenged the results of the election, charging ECS with a variety of unfair labor practices. An NLRB hearing officer rejected the Union's challenges.

The Union appealed. On June 11, 2002, the NLRB rejected the Union's appeal and certified the results of the election.

Before the Union's appeal was decided, however, it picketed at various ECS work sites including: the Residences of Lakeshore Drive, 55 East Erie, the University of Chicago Ratner Center, the Woodland School, Target at 87th and Cottage Grove, Glenview Middle School, the Venetian at 230 West Division and 71 West Wacker. ECS claims that the picketing was intended to, and did, induce neutral employees to stop working so their employers would cease doing business with ECS, a violation of section 8(b)(4) of the NLRA. The Union says that there is no evidence that it violated the Act and seeks summary judgment on ECS' claims.

## Discussion

Section 8(b)(4) of the NLRA prohibits the Union from picketing ECS at a shared work site if one of the objects of that picketing is to induce or encourage neutral employees to stop work so their employers will cease doing business with ECS. See 29 U.S.C. § 158(b)(4). Section 8(b)(4) is not violated, however, simply because the Union's picketing has substantial or foreseeable secondary effects. Mautz & Oren, Inc. v. Teamsters, Chauffeurs & Helpers Union, Local No. 279, 882 F.2d 1117, 1121 (7th Cir. 1989). Rather, such picketing is unlawful only if the Union "intend[s] to enmesh [a] secondary employer in the dispute." R.L. Coolsaet Constr. Co. v. Local 250, Int'l Union of Operating Eng'rs, 177 F.3d 648, 655 (7th Cir. 1999) (internal quotation marks and citation omitted).

To assess the Union's intent, we turn to the standards set out by the National Labor Relations Board in In re Sailors' Union of the Pac., 92 N.L.R.B. 547 (1950) ("Moore Dry Dock"). According to the NLRB, picketing at shared work sites is lawful if it meets the following standards:

> (a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer.

Id. at 549. The Moore Dry Dock standards are not dispositive, however. Rather, compliance with the standards merely creates a presumption of legality that can be rebutted by evidence of unlawful intent. R.L. Coolsaet, 177 F.3d at 655.

The Union picketed at least eight of ECS' work sites – the Residences of Lakeshore Drive, 55 East Erie, the University of Chicago Ratner Center, the Woodland School, Target at 87th and Cottage Grove, Glenview Middle School, the Venetian at 230 West Division and 71 West Wacker – on various dates between February and December 2002. (Pl.'s 56.1(b)(3)(B) Stmt. ¶¶ 25, 32, 39,

49, 73, 80, 85-86, 88, 96.) Though these pickets occurred at different sites on different dates, the Union concedes that they were all a part of a single strike against ECS. (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 19.) As a result, ECS says, proof of unlawful motive at one any site taints the motive for the whole strike.

Not surprisingly, the Union disagrees. In its view, each site must be judged separately, and any proof of unlawful motive must be confined to the site with which it is associated.

The Court agrees with ECS. The Union admits that all of its pickets were part of a single strike action against ECS and that "the object for picketing ECS remained consistent at each site and time throughout the picket." (Id.) Given those undisputed facts, it is appropriate to view the picketing against ECS, and the Union's motivation for it, as a whole.[1]

Viewed favorably to ECS, as it must be, the record contains sufficient evidence of unlawful motive to defeat the Union's motion. First, Union business agent Kevin Burke admits that the intent behind the ECS picket was to get neutral parties on the sites to stop working. (ECS' App. Opp'n Summ. J., Ex. 15, Burke Dep. at 17-18.) Though Burke's statement could also be interpreted innocently, i.e., that the Union hoped, but did not intend, that neutrals would honor their picket, it is ECS, not the Union, that is entitled to all reasonable inferences from the evidence. Because Burke's statement supports the inference that the Union harbored impermissible secondary intent, at this stage, that is how we must interpret it.

ECS also says that the Union never picketed it at its own offices, but chose to picket only where neutral employers were present, (Pl.'s LR 56.1(b)(3)(B) ¶ 23), another sign of unlawful intent.

---

[1] Given the facts of this case, we need not, and do not, decide, as ECS urges, that it is always proper to treat multi-site pickets as one unit.

See, e.g., R.L. Coolsaet, 177 F.3d at 655-56 (affirming district court's holding that union violated section 8(b)(4) based, in part, on finding that "union[] fail[ed] to target [the primary employer] with its pickets and focus[ed] instead on areas where it knew [the neutral employer] was working"). In addition, there is evidence to suggest that the Union: (1) asked truck drivers who approached the Woodland School and Glenview Middle School sites to honor the pickets (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 56, 62, 82); (2) asked the business agents for other unions on the Woodland School project to honor the Union's pickets (id. ¶¶ 62, 69); and (3) had "an observer," who was patrolling the neutral gate at the Woodland School site, videotape people who entered the site (id. ¶¶ 59-60), all of which are impermissible attempts to enmesh neutral employees in the dispute. See, e.g., Texas Distrib., Inc. v. Local Union 100, United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada, 598 F.2d 393, 399 (5th Cir. 1979) (telling other unions that routinely honor picket lines about planned picket indicates unlawful motive), abrogated in part on other grounds, Summit Valley Indus., Inc. v. Local 112, United Bhd. of Carpenters & Joiners of Am., 456 U.S. 717 (1982); N.L.R.B. v. United Slate, Tile & Composition Roofers, No. 89-3388, 1992 WL 372381, at *18 (3rd Cir. Aug. 10, 1992) (stating that union "intimidated neutral employees and suppliers by videotaping and photographing them"). Finally, there is evidence that the Union told: (1) the managers of the Target Store site at 87th and Cottage Grove that picketing would continue, even though ECS was off site, until the Union received a letter from Target saying that ECS would no longer be used on the project (id. ¶¶ 77-78); (2) the managers of the Residences of Lakeshore Drive and 55 East Erie projects that the only way to end the picket was to hire a union contractor for the testing (id. ¶¶ 26-27, 34-36); and (3) the managers of the Venetian at 230 West Division that ECS could not be on the site because it was non-union (id. ¶ 86), statements that have been deemed

impermissibly coercive. See, e.g., R.L. Coolsact, 177 F.3d at 656 (statements to secondaries that "the pickets would remain until [the primary] was removed" from the site "strongly support the notion that at least one of Local 150's purposes was to exert secondary pressure); N.L.R.B. v. Local 307, Plumbers, United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus. of U.S. & Canada, 469 F.2d 403, 409 (7th Cir. 1972) (affirming NLRB's finding that union intended to exert secondary pressure by, among other things, telling secondary employer the only way to end picketing was to replace primary with a union plumber).

In the Union's view, its requests to neutrals to honor the pickets betrays no unlawful intent. Such requests were explicitly sanctioned by the NLRB, it says, in Teamsters, Chauffeurs, Warehousemen & Helpers, Local 542, 191 N.L.R.B. 515 (1971) ("Shaker Express"). In that case, a union member lawfully picketing a delivery service, followed one of its trucks to two different customer locations, informing the clerks of the picket and asking them not to accept the shipments. Id. at 525. Because the picketing was presumptively lawful and the "[t]here [was] no indication that the appeal to either clerk was aimed at disruption of the business of his employer," the Board said it was not illegal secondary activity. Id.

But the Union's alleged conduct at the Woodland School site is quite different from that of the Teamsters in Shaker Express. According to ECS, Union representatives asked neutral truck drivers to honor their picket, even when ECS was not on site. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 53-56.) They also asked other, sympathetic unions representing neutral employees to intercede on its behalf, which they did, effectively shutting the job down. (Id. ¶¶ 61-70.) Finally, lest any neutral employee be tempted to cross the picket line, the Union stationed an "observer" at the neutral gate to videotape the activities there. (Id. ¶¶ 59-60.) Those facts suggest that the Union's appeals to

neutral employees, unlike those of the Teamsters in Shaker Express, were designed to disrupt the business of secondary employers, a clear violation of section 8(b)(4).

The Union also contends that its suggestion to various project managers that they hire union testers is lawful under N.L.R.B. v. Servette, 377 U.S. 46 (1964). In that case, a union that was striking Servette, a supplier of goods to food stores, asked food store managers to discontinue handling Servette's goods or risk handbilling at their stores asking customers not to buy Servette-supplied products. Id. at 47-48. The Supreme Court held that the union's conduct did not violate section 8(b)(4):

> [T]he Local, in asking the managers not to handle Servette items, was not attempting to induce or encourage them to cease performing their managerial duties in order to force their employers to cease doing business with Servette. Rather, the managers were asked to make a managerial decision which the Board found was within their authority to make.

Id. at 50-51. In Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, 377 U.S. 252 (1964), the Court put it another way: "A union is free to approach an employer to persuade him to engage in a boycott, so long as it refrains from the specifically prohibited means of coercion through inducement of employees." Id. at 259 (internal quotation marks and citation omitted).

Viewed favorably to ECS, the record precludes the Union from taking refuge in Servette. The Teamsters in Servette did not close down the food stores, by inducing lower-level employees to stop work, before asking the store managers not to handle the struck goods. But that is exactly what the Union is alleged to have done here: shut down job sites by inducing all neutral employees to stop working and then "suggesting" to management that a union testing contractor be hired. Because the Union's alleged statements were not simply non-coercive requests for support, Servette does not shield it from suit.

In addition to that direct evidence of the Union's intent, the record also suggests that the Union violated the Moore Dry Dock standards at several of the sites. ECS has offered evidence that: (1) the Union picketed at the Woodland School, the Glenview Middle School and the University of Chicago Ratner Center sites when no ECS employee was present (Pl.'s LR 56.1(B)(3)(B) Stmt. ¶¶ 43, 52-56, 84); (2) the Union picketed the neutral gate at the University of Chicago Ratner Center site after a reserve gate had been designated for ECS (id. ¶¶ 46-47); and (4) the Union handbilled the Glenview Middle School site with handbills that did not identify ECS as the target (id. ¶ 79).

Even if there is some evidence of unlawful intent, the Union says that evidence of causation is sorely lacking. Section 303 of the LMRA permits anyone who is "injured in his business or property by reason of a violation of [Section 8(b)(4)]" to sue for damages. 29 U.S.C. § 187. Thus, ECS can only recover if there is a nexus between the allegedly unlawful activity and its injuries. In the Union's view, to the extent there is any evidence of unlawful activity, it is confined to the University of Chicago Ratner Center, Woodland School and Glenview Middle School sites, sites for which ECS seeks no damages. (See Def.'s Materials Supp. R. 56.1 Stmt., Ex. 30, 3/24/03 Stipulation at 2.) Because the record shows that the Union complied with Moore Dry Dock at the five other sites, the Union says the causal nexus between the allegedly unlawful activity and ECS' damages is missing.

The Court disagrees. The Union draws an artificial distinction between unlawful conduct and unlawful intent. Section 8(b)(4) deems the Union's conduct unlawful if it induced or encouraged neutral employees to stop working to force the site managers to sever their relationships with ECS. In other words, whether the Union's conduct was unlawful, depends on its intent. Courts try to divine intent from conduct, using the Moore Dry Dock standards as a guide. But, as our court

-8-

of appeals has emphasized, those standards are only a guide. Compliance with Moore Dry Dock does not sanitize section 8(b)(4) violations when there is independent evidence of unlawful intent. R.L. Coolsact, 177 F.3d at 655.

Viewed favorably to ECS, the record reveals such independent evidence with respect to all eight sites, including: (1) Kevin Burke's statement that the purpose of each ECS picket was to get other trades to stop working (ECS' App. Opp'n Summ. J., Ex. 15, Burke Dep. at 17-18); (2) the Union's decision to picket ECS only where neutral employers were present (Pl.'s LR 56.1(b)(3)(B) ¶ 23); (3) the Union's direct appeals to neutrals at the Woodland School and Glenview Middle School sites to honor the pickets (Id. ¶¶ 56, 62, 82); (4) the Union's request that other unions aks their members to honor the pickets (id. ¶¶ 62, 69); and (5) the Union's statements to the managers of the Target Store site at 87th and Cottage Grove, the Residences of Lakeshore Drive, 55 East Erie and the Venetian projects that picketing would continue until a union testing contractor was hired to replace ECS (id. ¶¶ 26-27, 34-36, 77-78, 86). Because there is evidence to suggest that the Union intended to enmesh neutrals in this dispute, even at the sites where its picketing complied with Moore Dry Dock, ECS has established a sufficient nexus between the Union's allegedly unlawful conduct and its damages to defeat this motion.

Even if causation evidence exists for the other sites, the Union insists that it is absent for 71 West Wacker. According to the Union, the record establishes that its actions at that site were directed at STS, another testing company, not ECS. There is some force to the Union's argument. For example, the Union asserts, without contradiction, that it did not even know ECS was on site when it picketed at 71 West Wacker. (See Def.'s LR 56.1(a)(3) Stmt. ¶ 157; Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 157.) Moreover, though the record suggests that the Union told the project managers that

the picketing, which had shut down the job and was occurring even when no STS employees were on site, would end only when STS was replaced by a union firm, (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 96-100), there is no evidence that the Union made similar statements with respect to ECS. Unfortunately for the Union, there is also evidence that the picketing ended when ECS was terminated, even though STS remained on the job. (Id. ¶ 101.) That single fact is sufficient, if not overwhelming, evidence that the Union's actions at 71 West Wacker were directed against ECS. Accordingly, the Union is not entitled to summary judgment with respect to that site.

Finally, the Union contends that its motion should be granted because: (1) ECS' damage evidence, in general, is insufficient; and (2) it cannot, as a matter of law, recover for profits lost as a result of lost opportunities to bid on future contracts because such damages are too speculative. We will address the latter issue first.

Unlike some other courts, the Seventh Circuit has not ruled that lost profits on future contracts are always too speculative to be recoverable. Rather, the court has said that such damages are recoverable if they can be estimated with reasonable certainty. See BE&K Const. Co. v. Will & Grundy Counties Bldg. Trades Council, 156 F.3d 756, 770 (7th Cir. 1998). Moreover, our court of appeals has said, when "the uncertainty as to the damages stems from the defendants' illegal conduct, the defendants should not benefit from the uncertainty they created: Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer." Id. (internal quotation marks and citation omitted). Thus, to the extent ECS can reasonably quantify its alleged damages for lost future profits, it can recover for them.

That brings us back to the first issue: Has ECS adequately quantified its damages? According to the Union, Brett Gitskin, the witness proffered by ECS on damages, was only able to

quantify damages at two of the eight sites. ECS admits that Gitskin was initially unable to provide a full accounting of ECS' damages, but says he can do so now with the help of a report from an expert witness that ECS has since withdrawn. The propriety of Gitskin's reliance on that expert report is the subject of a motion currently pending before Magistrate Judge Keys. Until that motion is resolved, the damages issue is not ripe for decision. Consequently, the Union is given leave to renew its motion for summary judgment *solely on the damages issue,* if such is appropriate, after the motion concerning Brett Gitskin's use of the expert report has been resolved.

### Conclusion

For the reasons set forth above, the Union's Rule 56(c) motion for summary judgment is denied.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

DATED: 10/29/03